494 A.2d 999

Ulyesses C. BROWN AKA Cornelius Brown
AKA Keith Brown

v.

STATE of Maryland.

No. 1632, Sept. Term, 1984.

Court of Special Appeals of Maryland.

July 12, 1985.

Certiorari Denied Oct. 21, 1985.

Isaac S. Kershner, Assigned Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on brief), for appellant.

Valerie J. Smith, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Kurt L. Schmoke, State's Atty. for Baltimore City and Jack Lesser, Asst. State's Atty. for Baltimore City, Baltimore, on brief), for appellee.

Submitted before WILNER, GARRITY and ALPERT, JJ.

WILNER, Judge.

There are, as we shall see, a number of issues raised in this criminal appeal. The central one is whether the mere pointing of a handgun by a fleeing felon at a person in pursuit, without any evidence that the gun was loaded, or of a verbalized threat to shoot, or of any attempt to fire the weapon suffices to sustain a conviction for assault with intent to murder. We think it does not.

In the early evening of October 16, 1982, two men, both armed with handguns, entered a Rite-Aid drugstore in Baltimore City. One of them pushed the manager, James Alloway, and one of the cashiers, Louise Cutting, into the manager's office; at gunpoint, he forced Alloway to open the safe, from which he took some $7,000 and then fled. The second man, identified at trial as appellant, approached the other cashier, Betty Keys, and, at gunpoint, demanded and took the money in her cash register. He then fled with his colleague.

Namon Brown, an off-duty State trooper, was standing in the entranceway to the store, between the inner and outer sets of glass doors, when appellant came charging out and bumped into him. Upset at the collision, Brown made a sarcastic remark to appellant who responded with merely "a hostile look on his face." Brown then approached appellant, apparently to escalate the dispute, when the second gunman ran out of the store followed by Alloway screaming "we've been robbed . . . they got guns." Brown, momentarily distracted, turned his attention again to the fleeing suspects, who backed out of the outer doors and proceeded on to the adjacent parking lot toward a parked car. Brown noticed that both men were armed with handguns, which were not then pointed at anyone.

Retrieving his own gun from a leg holster, Brown, joined by Alloway, gave chase. One of the suspects jumped into the driver's side of the car; appellant tried to enter the

passenger's side but, for some reason was unable to get the door open. As Brown, followed by Alloway, reached within 20 to 25 feet of the car, appellant turned and pointed his gun at either or both of them; Brown said the gun was pointed at his stomach. Brown fired at appellant. As he did so, the driver kicked open the passenger door and appellant fell backward into the car, which then was driven off. Brown cut across the lot on foot, hoping to meet up with the car on an adjacent street and be able to shoot again. He testified: "I was in time and had the vehicle and the suspects in view when I noticed the passenger starting to crank down the window with his gun in his hand as if preparing to fire at me." He further explained, however:

"Q   When he pointed the gun at you for the second time do you know what part of your body it was pointed at?

A   He didn't point it the second time. He had it up in the air in this fashion as he was cranking on the window."

There was no evidence as to whether appellant's gun was loaded. There was no evidence of any articulated threat by appellant to shoot Brown. There was no evidence that appellant ever cocked the gun or attempted to pull the trigger. The evidence showed that he did not, in fact, ever actually fire the gun during the incident.

Because of other traffic on the street, Brown withheld firing his gun and instead attempted to pursue the bandits in his own car. They eventually eluded him. Appellant, to whom the escape vehicle was registered, was apprehended later.

For his role in these events, appellant was charged, convicted, and sentenced in the Circuit Court for Baltimore City as follows:

(1) As to the cashier, Betty Keys:

Robbery with a deadly weapon—25 years mandatory sentence under Md.Code Ann. art. 27, § 643B(c);

Use of handgun in commission of crime of violence—20 years consecutive;

(2) As to the manager, James Alloway:

Robbery with a deadly weapon—20 years consecutive;

Use of handgun in commission of crime of violence—20 years consecutive;

(3) As to the cashier, Louise Cutting:

Assault—10 years concurrent; and

(4) As to the off-duty Trooper, Namon Brown:

Assault with intent to murder—15 years concurrent;

Use of handgun in commission of crime of violence—15 years, consecutive to all other sentences.

The sentences, in the aggregate, total 100 years.

## I. *Assault With Intent To Murder*

Appellant raises seven issues in this appeal, the first four of which challenge the convictions based on his encounter with Namon Brown. The evidence relating to that encounter has been recited above. The court, over objection, instructed the jury that "[o]ne may be guilty of assault with intent to murder by pointing a deadly weapon at a vital part of another person's body." Presumably, the verdict on the assault with intent to murder count was based upon that instruction. That verdict, in turn, formed the basis of the related handgun conviction, *i.e.*, the assault with intent to murder Namon Brown was the predicate crime of violence.

Appellant argues that an intent to murder cannot be inferred from the mere pointing of the weapon, and that, accordingly, not only was the instruction in error but the evidence was insufficient to sustain the conviction. If, on that basis, the assault with intent to murder conviction falls, the accompanying handgun conviction must fall with it.

In considering this argument, we note, by way of preface, that there can be little doubt that appellant's action of brandishing and aiming the gun amounted to a common law assault, *Tender v. State,* 2 Md.App. 692, 699, 237 A.2d

65 (1968); Clark and Marshall, *Law of Crimes*, 7th ed., § 10.17.[1] But, as has been made clear many times, and, indeed, as is evident from the very name of the crime, to support a charge of assault with intent to murder, there must be proof of both an assault and an intention to murder. *Webb v. State*, 201 Md. 158, 161, 93 A.2d 80 (1952). Moreover, although an intent to murder may, and generally must, be established by inference, the intent "cannot be inferred from the mere fact of the assault." *Webb*, at 161, 93 A.2d 80; *Beall v. State*, 203 Md. 380, 385, 101 A.2d 233 (1953).

■■■ Although it has been said that an intent to murder cannot be established as a matter of law "from the mere use of a deadly weapon," the *use* of such a weapon in an assault is a factor to be considered. *Webb*, 201 Md. 1 at 161, 93 A.2d 80. Thus, the rule has evolved that "the intent to murder necessary to a conviction may rest upon the showing of an intent to commit grievous bodily harm, and that, in turn, is inferable from the *use* of a deadly weapon directed toward a vital part of the body." (Emphasis added.) *Jenkins v. State*, 59 Md.App. 612, 616, 477 A.2d 791 (1984), *cert. granted* 302 Md. 46, 485 A.2d 269, citing *Bird v. State*, 231 Md. 432, 190 A.2d 804 (1963); *Webb v. State, supra; James v. State*, 31 Md.App. 666, 358 A.2d 595, *cert. denied* 278 Md. 725 (1976); and *Reed v. State*, 52 Md.App. 345, 449 A.2d 448, *cert. denied* 294 Md. 653, 452 A.2d 428 (1982).

■■■ The problem, in the context of this case, comes down to the phrase *"use* of a deadly weapon." (Emphasis added.) There can be no doubt that, if the assailant actually shoots the victim in "a vital part of the body" or even shoots *at* a vital part of the victim's body, the requisite intent to mur-

---

1. It would seem as well, although the question is not before us, that appellant could have been charged under Md.Code Ann. art. 27, § 386—assault "with intent to prevent the lawful apprehension ... of any party for any offense for which the said party may be legally apprehended...."

der may be found by factual inference. *Webb v. State, Bird v. State, Jenkins v. State,* and *cf. Reed v. State,* all *supra;* also *Brooks v. State,* 38 Md.App. 550, 381 A.2d 718 (1978), *aff'd* 284 Md. 416, 397 A.2d 596 (1979). In that situation, the inferred intent arises not from the mere assault, which may consist of the brandishing of the weapon, but from the shooting.

Where there is no actual shooting, it is necessary to find some other basis for the inference. One such basis may be a contemporaneously expressed threat to shoot the victim. *See Shenberger v. State,* 234 Md. 363, 364, 199 A.2d 233 (1964), where the defendant put a loaded gun to the victim's ear, told her that "after he had used it on her he was going to turn it on himself," and, following a struggle, again attempted to point the gun at the victim. The Court concluded that "the pointing of the deadly weapon at the head *and the expressed intention to kill,* followed by the struggle to again point the gun at the [victim] established the necessary elements of the crime of assault with intent to murder." *Id.,* 365, 199 A.2d 233. (Emphasis added.) *See also Beall v. State, supra,* 203 Md. 380, 101 A.2d 233.

In *James v. State,* 31 Md.App. 666, 358 A.2d 595, *cert. denied,* 278 Md. 725 (1976), the police received a report that a man had been randomly shooting a pistol on a public street and that he had entered a certain house. Three officers proceeded to the house and were admitted by the defendant's sister. As one proceeded down the hall, he was shot and killed by the defendant; the other officers left the house; one, Officer Nowakowski, "took a position outside, to the left of the front steps, and testified that he presently found himself looking down the barrel of a revolver in [the defendant's] hand. He [the officer] fired three shots but [the defendant] withdrew into the house, unscathed." *Id.,* 670, 358 A.2d 595. On this evidence, we concluded that James not only pointed a deadly weapon at a vital part of Officer Nowakowski's body but "would have shot Officer Nowakowski had the policeman not fired first at the [defendant], forcing him to retreat into the house." *Id.,* 675,

358 A.2d 595. That second conclusion, of course, rested not on the mere pointing of the weapon at Officer Nowakowski, but on the fact that the defendant had previously shot the other officer.

In *Brown v. State*, 29 Md.App. 467, 349 A.2d 267 (1975), *cert. denied*, 277 Md. 736 (1976), the defendant, on a bike, grabbed a purse from the victim as she and her mother were unloading packages from her car. The victim testified at p. 469, 349 A.2d 267:

"My mother started screaming. And this person who was still on the bike pointed a gun at my stomach and the gun was clicked several times. Then, the person on the bike started down the street and turned around and again aimed the gun at me; then he clicked his gun several times and then I went in the house."

That was not enough, we said, to sustain a conviction of assault with intent to murder. At 471–72, 349 A.2d 267:

"On the record before us, it cannot be said, with any degree of certainty, whether the gun was loaded and simply misfired, or was unloaded. The assertion by appellant's counsel that the gun involved was unloaded is simply a bald allegation without a shred of supportive evidence. The appellant denied being at the scene of the crime; the gun was never produced by the State; no description of the gun is in evidence; and the victim simply heard the gun click a number of times. Speculatively, it could have been a toy gun, a so-called starter's gun firing only blank cartridges, or it could have been a lethal firearm. The evidence simply does not establish factually anything other than a 'gun' was pointed at the victim by the appellant and she heard it click several times on two different occasions. In the absence of some evidence from which the trier of fact, in this instance the jury, could ascertain whether or not the gun was or was not loaded, or was, in fact, an operable firearm, it cannot be said, with any degree of certainty or beyond a reasonable doubt, that the appellant intended the assault upon the victim to end in murder or grievous bodily harm.

Due process 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' *In re Winship,* 397 U.S. 358, 364 [90 S.Ct. 1068, 1072, 25 L.Ed.2d 368]. Under the circumstances, we think the failure of the State to establish whether the gun, as used in the assault, was capable of killing the victim or inflicting grievous bodily harm constituted a fatal flaw in the proof. Accordingly, we are compelled to find that the evidence was not legally sufficient to sustain the appellant's conviction of the crime of assault with intent to murder."

■ The view taken in *Brown* is perhaps an extreme one (*compare State v. Heitman,* 613 S.W.2d 902 (Mo.App. 1981)), but it is not necessary for us either to reconsider or rely on it in this case. As noted, here there was no evidence that appellant ever attempted, in any way, to discharge his gun. The record, then, reveals nothing more than the mere assault itself—the pointing of the weapon—and that clearly, is not enough. For that reason, we shall reverse the two unfavorable judgments entered on Indictment 18234219— assault with intent to murder Namon Brown and the related handgun violation—absolutely, without retrial.

## II. *Other Handgun Charges*

■ In an effort to weave his way through a number of earlier cases, which he asserts amount to "conflicting signals" by this Court, appellant argues that, in order to sustain a conviction for unlawful use of a handgun, the State must prove that the weapon used was, indeed, an operable firearm, and that no such evidence was adduced in this case. His argument is entirely without merit, but, because some of the language used in the cases cited by him if taken beyond the context of its use, could appear to create some ambiguity, we shall attempt to restate the applicable law.

In 1972, the General Assembly enacted a new, comprehensive law regulating the carriage, transport, and use of handguns. The purpose of the enactment was spelled out in a preamble—a declaration of policy codified as § 36B(a) to art. 27. The Legislature found that there had been an alarming increase in the number of violent crimes involving the use of handguns, that, as a consequence, there had also been a substantial increase in the number of persons killed or injured by reason of the carrying of handguns in public by persons inclined to use them in criminal activity, that current laws had not been effective in curbing the more frequent use of handguns in perpetrating crime, and that "[f]urther regulations on the wearing, carrying, and transporting of handguns are necessary to preserve the peace and tranquility of the State and to protect the rights and liberties of its citizens." To that end, the Legislature, in the balance of § 36B, made it a criminal offense to wear, carry, or transport a handgun in public without a permit (subject to certain exceptions) and, in subsection (d), to use a handgun in the commission of a felony or crime of violence.

The term "handgun" is defined in § 36F. For purposes of § 36B, it "shall include any pistol, revolver, or other firearm capable of being concealed on the person" but does not include a shotgun, rifle, or antique firearm. That is our working definition.

In *Howell v. State,* 278 Md. 389, 364 A.2d 797 (1976), the defendant attempted to commit a robbery by threatening the victim with a weapon that turned out to be a "tear gas pistol." When fired, the weapon expelled "a rather large quantity of very fine particles ... which are highly irritating to the eyes," *Id.* 391, 364 A.2d 797, but, according to expert testimony in the case, it could not be readily "converted into ... a gun which would be explosive of projectiles." *Id.* 390–91, 364 A.2d 797. Looking closely at the § 36F definition of "handgun" in the light of the Federal Firearms Act and general dictionary definitions, the Court concluded that, (1) to be a handgun, the weapon had to be a

firearm or easily convertible into a firearm, (2) "to be a firearm it must propel a missile by gunpowder or some such similar explosive," and (3) "the gas here involved is not a missile within the natural and ordinary signification of the term." *Id.,* 396, 364 A.2d 797. Those were the holdings, and the only holdings, in *Howell. See also Tisdale v. State,* 30 Md.App. 334, 353 A.2d 653 (1976), and *Pharr v. State,* 36 Md.App. 615, 375 A.2d 1129 (1977).

In *Couplin v. State,* 37 Md.App. 567, 378 A.2d 197 (1977), *cert. denied* 281 Md. 735 (1978), we dealt with precisely the issue raised here. There was an armed robbery; the victim described the weapon, which was neither fired nor recovered, as a handgun. Couplin argued that, in that circumstance, the evidence failed to establish that the weapon was indeed "capable of firing a projectile by an explosive propellant," as required by *Howell.* We rejected that argument. At 578, 378 A.2d 197:

> "It is one thing to say that, where the weapon alleged to be a handgun is produced and examined, and the evidence either shows that it was not a handgun or fails to demonstrate adequately that it was, there can be no conviction. It is quite another to extend the 'sufficiency' theory to produce the same result when, despite credible testimony that the assailant used a weapon described as a handgun, a small pistol, the weapon was not subject to empirical examination because it was not recovered. There is no suggestion in any of the three cases [relied on by Couplin— *Todd v. State,* 28 Md.App. 127 [343 A.2d 890] (1975); *Tisdale v. State, supra,* 30 Md.App. 334 [353 A.2d 653] and *Howell v. State, supra,* 278 Md. 389, 364 A.2d 797], or in any other brought to our attention, that a conviction is unobtainable under this latter circumstance.

In *Todd,* this Court stated at 28 Md.App. 132 [343 A.2d 890], that, '[t]angible evidence in the form of the weapon used in an offense certainly is not an essential to proof of the use of a weapon.' *A fortiori,* such proof may rest upon extrinsic evidence as to the nature of the weapon. The statute, § 36B(d), does not require that the weapon

actually be fired, as an element of the crime, and we do not believe that, in the absence of the weapon's recovery, there is any requirement that it be fired simply to provide evidence of its 'fireability.' When Ms. Day testified that the appellant stuck a handgun, which she described as a small pistol, in her neck, and there was no other evidence, except appellant's alibi and general denial, to contradict, must [*sic* ] less controvert, that testimony, the State, in our judgment, produced sufficient evidence of the use of a handgun in the commission of a felony or crime of violence to have the issue considered by the jury and to sustain the verdict rendered by it."

We have sent no conflicting signals on this issue. Indeed, in *Harrod v. State*, 39 Md.App. 230, 250, 384 A.2d 753 (1978), and *Johnson v. State*, 44 Md.App. 515, 516–19, 411 A.2d 118 (1980), we relied upon and thereby confirmed our holding in *Couplin*.

In *York v. State*, 56 Md.App. 222, 467 A.2d 552 (1983), we were presented with an issue akin to that in *Howell*. There was an armed robbery. The weapon was recovered. It was a pistol—a firearm designed to discharge a bullet by means of explosive gunpowder, but, because it had, at some undefined point, been dropped, when the police recovered it they found that it was temporarily inoperable—the cylinder would not revolve by using merely "ordinary pressure" on the trigger. The evidence showed, however, that, even in its damaged condition, a person with "unusual strength" could fire the weapon, and, in addition, by using a hammer and a screwdriver, one could restore the weapon to operable condition in about one minute.

We affirmed the handgun conviction. Referring to the legislative declarations in § 36B, we noted that the intent of the law was to deal specifically with the problem of handguns, and that if, at the time of the offense, the weapon "is not then so useable" as a handgun, it does not fall within the purview of the Act. But the evidence showed that the weapon at issue could, in fact, have been so used, or could

easily have been altered for such use, and for that reason sufficed as a handgun.

*York* does not contradict or detract from *Couplin.* *York,* like *Howell,* simply says that, to be a handgun for purposes of § 36B, the weapon must have the characteristics implicit from the definition in § 36F, and that, if the evidence shows that the weapon did not have those characteristics at the time it was used, it is not a handgun within the meaning of § 36B. *Couplin* permits the proof of those characteristics to be by inference when more direct, empirical evidence is unavailable. That was the case here. The weapon employed by appellant was adequately described by Officer Brown as a "detective type special" .38 caliber revolver, "the same as the type I was carrying myself." Under *Couplin,* that suffices.

### III. *Closing Argument*

Appellant's final claim of error is that he was deprived of a fair trial and due process of law because of improper argument by the prosecutor.

In rebuttal argument, the prosecutor asserted:

"[O]ne of the things you have to keep in mind when you're thinking about Mr. Epstein's [defense counsel] argument is the fact that he is a defense lawyer and I knew full well when I came into this Courtroom this morning that Mr. Epstein was not going to come up before you and say oh, look, ladies and gentlemen, my client—he is guilty, please convict him. I knew he wasn't going to do that. His job is to do everything that he can—"

Appellant objected to this statement, but the objection was overruled. Subsequently, the prosecutor stated:

"Now, the uncontradicted evidence in this case is very strong. As a matter of fact, it's overwhelming. We don't think that we have the right person. We don't think that we have one of the two people who were involved in this armed robbery sitting at the trial table.

We know that we have the right person and we know that that person is sitting at this trial table—"

Appellant objected to this argument also, but again was unsuccessful.

■■■ Although argument of counsel is, of course, generally subject to control by the court, great latitude is usually permitted. It is primarily a matter of the trial court's discretion, which will not be disturbed on appeal absent an abuse of a character likely to have injured the complaining party. *Wilhelm v. State*, 272 Md. 404, 326 A.2d 707 (1974). Thus, even if a comment made by a prosecutor in closing argument is improper, it does not necessarily compel that the conviction be set aside. Rather, a conviction will only be set aside where it appears that the jury was misled to the prejudice of the defendant. *Id.* at 415–16, 326 A.2d 707.

■■■ We fail to see how the jury was misled to the appellant's prejudice as a result of these comments, and accordingly conclude that appellant is not entitled to a new trial on this ground.

JUDGMENTS ON INDICTMENT NO. 18234219 REVERSED; OTHER JUDGMENTS AFFIRMED; COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANT AND MAYOR AND CITY COUNCIL OF BALTIMORE.