516 A.2d 204

**Lloyd Lorenzo HALL**

v.

**STATE of Maryland.**

**No. 99, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Oct. 21, 1986.

Certiorari Denied Jan. 27. 1987.

Isaac S. Kershner, Assigned Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Valerie W. Loftin, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Baltimore, Andrew L. Sonner, State's Atty. for Montgomery County, and John McCarthy, Asst. State's Atty. for Montgomery County, Rockville, on the brief), for appellee.

Argued before GARRITY, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

At a jury trial in the Circuit Court for Montgomery County, Lloyd Lorenzo Hall, the appellant, was convicted of burglary, theft, three counts of assault with intent to murder, three counts of assault with intent to prevent lawful apprehension, three counts of use of a handgun in a crime of violence, and one count of carrying a handgun. For these crimes, he was sentenced to a total of 80 years imprisonment.[1]

The appellant challenges his convictions on various grounds. The State has cross-appealed from the court's refusal to impose a life sentence without parole upon the appellant, asserting that such sentence is mandatory under Md.Code (1957, 1982 Repl.Vol., 1985 Supp.), Art. 27, § 643B(b).

The events leading to the charges against the appellant began at approximately 3:00 a.m. on July 25, 1984, when Donna L. Haviland was alone at her home in Rockville, asleep in the second story bedroom. She was awakened by a light shining through an air vent in the floor and could see shadows of activity by someone moving about the first floor rooms of the house. Since her husband was not expected to return from the night shift of his employment until 7:00 a.m., Mrs. Haviland was understandably terrified by the presence of an apparent intruder in her home. She arose from bed and quietly walked to the head of the stairway leading to the first floor in an effort to determine who had entered the house. As she stood there, she heard an automobile engine being started in front of her home. Proceeding to the front window of her bedroom, she saw her 1981 Honda automobile backing down the street in front

---

1. In imposing sentence, the trial judge merged the three counts of assault with intent to prevent lawful apprehension into the corresponding counts of assault with intent to murder.

of the house. She was unable to identify the driver or to determine whether there were any passengers in her car.

Mrs. Haviland then proceeded downstairs and, after satisfying herself that no one was present, noticed that her car keys had been removed from her purse. She immediately reported the burglary and automobile theft to the Montgomery County Police Department. Officers from that department promptly responded to her home, and a report of the stolen vehicle was broadcast on the police radio.

Shortly after 3:30 a.m., Officer David Godbold of the Montgomery County Police Department, who heard that broadcast, spotted the stolen Honda near a shopping center in Rockville. A chase ensued in which Officer Godbold, along with Montgomery County Police Officers George Hanville and Scott Wyne, each operating a patrol car, pursued the stolen vehicle, which was being driven by the appellant. After driving into an apartment complex, the appellant, who was alone, abandoned the Honda and ran into a nearby dark wooded area.

Continuing the chase on foot, the three police officers and Officer Godbold's K–9 dog followed the appellant. Officer Godbold released the dog, an 80–pound German shepherd, with a command to catch the fleeing suspect. Shortly thereafter, as the officers reached the edge of the wooded area, they heard a gunshot and saw a muzzle flash. They dove to the ground for cover. A few seconds later the officers heard a second gunshot. Officer Godbold immediately ordered his K–9 dog to retreat. Meanwhile, Detective Roger Thompson of the Montgomery County Police, responding to the broadcast of the pursuit, arrived at the opposite side of the wooded area. Observing the appellant emerge from the woods, Detective Thompson apprehended him and recovered a handgun. The gun, which had a strong odor indicating a recent firing, contained three live shells and two spent shell casings.

The appellant presents these issues:

    I. The testimony of a State's witness concerning fingerprints taken from the appellant deprived the

appellant of a fair trial and due process by revealing that the appellant had a prior arrest record.

II.  The evidence was insufficient to sustain the appellant's convictions for assault with intent to murder.

III.  The evidence was insufficient to sustain the appellant's convictions for assault with intent to prevent lawful apprehension.

IV.  The convictions for use of a handgun in a crime of violence are invalid due to the insufficiency of the evidence to sustain the purported predicate crimes of violence.

V.  The evidence did not support convictions on three counts of assault with intent to murder and three counts of use of a handgun in a crime of violence.

VI.  The trial court erred in permitting testimony that the appellant's fingerprint matched a latent print recovered from the scene of the burglary.

VII.  The trial court erred in denying the appellant's request for a jury instruction regarding lost evidence.

VIII.  The trial court's failure to keep the appellant's counsel informed as to communications with the jury in the course of jury deliberations deprived the appellant of a fair trial and due process.

In its cross-appeal the State questions the trial court's interpretation of Md.Code, *supra,* Art. 27, § 643B(a).

For purposes of our discussion, the issues will be grouped as follows: the aggravated assaults (appellant's arguments II–V); the fingerprint evidence (appellant's arguments I, VI–VII); the jury communications (appellant's argument VIII); sentencing (State's cross-appeal).

## THE AGGRAVATED ASSAULTS

The appellant questions the sufficiency of the evidence to sustain his convictions of assaulting Officers Godbold, Han-

ville and Wyne with intent to murder them and assaulting those officers with intent to prevent lawful apprehension. We first determine whether the elements of the assaults were established, since only if the evidence supports those charges need we address the special intent aspects of the appellant's alleged aggravated conduct.

### A. *The Assaults*

■ Assault is a common law offense that has been the subject of many definitions, frequently quoted and interpreted in the case law addressing the offense. *Dixon v. State*, 302 Md. 447, 456–59, 488 A.2d 962 (1985). As the Court of Appeals there observed, the crime of assault is defined to cover two types of circumstances: (1) attempts to commit battery, and (2) conduct tending to cause a reasonable apprehension of immediate bodily harm.[2] The case *sub judice* implicates the second type, for it is a case "where intimidation or putting in fear is the gravamen of the action." *Dixon v. State, supra,* 302 Md. at 459, 488 A.2d 962.

In *Dixon* the Court reviewed a conviction of assault with intent to rob arising from the attempted hold-up of a self-service filling station. The cashier at the filling station testified that Dixon had approached her while she was sitting inside a glass booth containing the station's cash register and safe. Dixon was carrying a newspaper folded underneath his arm as he approached the booth. In the drawer normally used for customer payments he placed a note stating "I want all your money and hurry." Based on the content of the note and the "cold, hard look" in Dixon's eyes, the cashier was convinced that Dixon had a weapon inside the newspaper. When the cashier dropped to the floor and pushed an alarm button, however, Dixon ran off.

---

**2.** *E.g.,* W. LaFave & A. Scott, *Handbook on Criminal Law* § 82, at 611 (1972); R. Perkins, *Perkins on Criminal Law* 114 (2d ed. 1969). LaFave and Scott point out that the second type of assault is an extension of the tort concept of assault to criminal law.

In upholding Dixon's conviction for assault with intent to rob, the Court of Appeals adopted this Court's definition of assault from *Lyles v. State,* 10 Md.App. 265, 269 A.2d 178 (1970), where Judge Orth wrote:

[A]ny attempt to apply the least force to the person of another constitutes an assault. The attempt is made whenever there is any action or conduct reasonably tending to create the apprehension in another that the person engaged therein is about to apply such force to him. It is sufficient that there is an apparent intention to inflict a battery and an apparent ability to carry out such intention.

*Id.* at 267, 269 A.2d 178, *quoted in Dixon v. State, supra,* 302 Md. at 458–59, 488 A.2d 962. *See also Williams v. State,* 4 Md.App. 643, 647, 244 A.2d 619 (1968), *cert. denied,* 252 Md. 734 (1969). Applying that definition to the facts in *Dixon,* the Court of Appeals concluded that the trial judge's finding of an assault was not clearly erroneous since the service station attendant had reasonable grounds to feel apprehensive about her safety based on the permissible inferences that she drew from Dixon's conduct under the circumstances there present. *Dixon v. State, supra,* 302 Md. at 463–64, 488 A.2d 962.

The evidence before us in the present case indicates that the three police officers who pursued the appellant were placed in fear of bodily harm when the appellant fired two shots. It seems entirely reasonable that the firing of those shots from a dark wooded area, at close enough range that the officers could see a muzzle flash, would cause the officers to believe that their safety was being threatened by the appellant. It matters not what the appellant's specific intention was in firing the gun since assault is a general intent crime. We hold that the appellant's conduct under these circumstances placed the officers in reasonable apprehension of immediate bodily harm and rendered him guilty of assaulting them.

### B. *Intent to Murder*

■ The specific intent element of assault with intent to murder was recently explored in *Glenn v. State*, 68 Md. App. 379, 511 A.2d 1110 (1986), where Judge Moylan, speaking for this Court, explained:

> Assault with intent to murder is, by its very wording, a specific intent crime. The obvious question is, "The specific intent to do what?" The obvious answer is, "The specific intent to bring about the death of the assault victim." In terms of the clear and unambiguous meaning of words, it is inconceivable that there could be an intent to murder the victim that did not intend for the victim to die.... Intended murder, by definition, comprehends, *inter alia*, an intended killing, to wit, an intent to kill.

*Id.* at 387–88, 511 A.2d 1110 (footnote omitted).

The State correctly asserts that the element of intent, due to its subjective nature, often must be inferred from the circumstances of the case. Nevertheless, "although an intent to murder may, and generally must, be established by inference, the intent 'cannot be inferred from the mere fact of the assault.'" *Brown v. State*, 64 Md.App. 324, 330, 494 A.2d 999, *cert. denied*, 304 Md. 296, 498 A.2d 1183 (1985) (quoting *Webb v. State*, 201 Md. 158, 161, 93 A.2d 98 (1952)). Nor does the use of a deadly weapon by itself establish intent to murder, although "the *use* of such a weapon in an assault is a factor to be considered." *Brown v. State, supra*, 64 Md.App. at 330, 494 A.2d 999 (emphasis in original). Rather, "the rule has evolved that 'the intent to murder necessary to a conviction may rest upon the showing of an intent to commit grievous bodily harm, and that, in turn, is inferable from the *use* of a deadly weapon directed toward a vital part of the body.'" *Id.* (quoting *Jenkins v. State*, 59 Md.App. 612, 616, 477 A.2d 791, *cert. granted*, 302 Md. 46, 485 A.2d 269 (1984)) (emphasis added in *Brown*). *See also Glenn v. State, supra*, 68 Md.App. at 411, 511 A.2d 1110. The requisite intent has also been found under circumstances where the assaulting party fired shots in the general direction of another, but in a random or

less precise fashion. *E.g., Jackson v. State,* 63 Md.App. 149, 156–57, 492 A.2d 346 (1985), *rev'd on other grounds,* 305 Md. 631, 506 A.2d 228 (1986); *Woodard & Demby v. State,* 13 Md.App. 114, 123, 282 A.2d 9, *cert. denied,* 263 Md. 723 (1971).

The record before us in the present case, however, is devoid of any evidence from which it can be inferred that the appellant acted with intent to kill the officers who pursued him. Because no one actually saw the appellant fire the gun, and there was no evidence as to the path that the discharged bullets took, no inference is permissible that the shots were even randomly directed at the officers. Applying the constitutional standard of review to these convictions of assault with intent to murder,[3] we hold that the evidence was insufficient to establish the requisite intent essential to the crime of assault with intent to murder.

### C. *Intent to Prevent Lawful Apprehension*

■ The short answer to the appellant's argument that there was insufficient evidence to sustain his convictions of assault upon the three police officers with intent to prevent lawful apprehension is that he has not preserved the issue for our review. Rule 1085. Not only did he fail to raise the question in his motions for judgment of acquittal at the conclusion of the State's case and at the conclusion of all of the evidence as required by Rule 4–324, *Lyles v. State,* 63 Md.App. 376, 492 A.2d 959, *cert. granted,* 304 Md. 362, 499 A.2d 191 (1985), but he conceded the sufficiency of the evidence to convict him of these charges at the argument on those motions. Nevertheless, for whatever solace it may give the appellant, if the question had been preserved, we would conclude that the evidence was legally sufficient.

---

**3.** " ... whether after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Rusk,* 289 Md. 230, 245, 424 A.2d 720 (1981).

■ We have earlier held that the evidence was sufficient to establish the appellant's assaults upon the officers. Turning briefly to the intent element of assault with intent to prevent lawful apprehension, that crime is a creature of statute now codified as Md.Code (1957, 1982 Repl.Vol.), Art. 27, § 386.[4]

The *mens rea* required to render one guilty of this crime is an "intent to prevent the lawful apprehension or detainer of any party for any offense for which the said party may be legally apprehended or detained." It is beyond cavil to suggest that Officers Godbold, Hanville and Wyne did not possess adequate probable cause to arrest the appellant without a warrant while they pursued him in the early morning of July 24, 1984. The uncontradicted evidence established that the appellant knew he was being pursued by these officers. The inference that he fired the shots in an effort to discourage the officers' efforts to apprehend him was a completely reasonable one. That inference provided legally sufficient evidence of the appellant's specific intent to support his convictions.

### D.  *Related Issues*

■ The appellant raises two other issues related to his convictions of the aggravated assaults. The first of these is that his convictions on charges of use of a handgun in a crime of violence[5] are invalid because the only predicate

---

**4.**  Section 386 states:
   If any person shall unlawfully shoot at any person, or shall in any manner unlawfully and maliciously attempt to discharge any kind of loaded arms at any person, or shall unlawfully and maliciously stab, cut or wound any person, or shall assault or beat any person, with intent to maim, disfigure or disable such person, or with intent to prevent the lawful apprehension or detainer of any party for any offense for which the said party may be legally apprehended or detained, every such offender, and every person counselling, aiding or abetting such offender shall be guilty of a felony and, upon conviction thereof, be punished by confinement in the penitentiary for a period not less than eighteen months nor more than ten years.

**5.**  The appellant was convicted under Md.Code (1957, 1982 Repl.Vol., 1985 Supp.), Art. 27, § 36B(d), which provides, in pertinent part:

crimes of violence were the six counts of aggravated assault on which the appellant argued insufficiency of the evidence. Since we are reversing the convictions for assault with intent to murder, the assaults with intent to prevent lawful apprehension remain as the only predicate crimes to support the convictions for use of a handgun in a crime of violence. Consequently, we must determine whether assault with intent to prevent lawful apprehension is a "crime of violence" as defined in Md.Code (1957, 1982 Repl.Vol., 1985 Supp.), Art. 27, § 441(e). Section 441(e) defines "crime of violence" as:

> ... abduction; arson; burglary, including common-law and all statutory and storehouse forms of burglary offenses; escape; housebreaking; kidnapping; manslaughter, excepting involuntary manslaughter; mayhem; murder; rape; robbery; robbery with a deadly weapon; sexual offense in the first degree; and sodomy; or an attempt to commit any of the aforesaid offenses; or *assault with intent to commit any other offense punishable by imprisonment for more than one year.* (emphasis added).

There are two possible constructions of the emphasized language in this statute. If the Legislature intended to include all aggravated assaults proscribed by our criminal code as crimes of violence, assault with intent to prevent lawful apprehension, being punishable "by confinement in the penitentiary for a period not less than eighteen months nor more than ten years" under § 386, would qualify as a crime of violence under § 441(e) since it is punishable "by imprisonment for more than one year." But, even if we construe the legislative intent to require that an assault, for inclusion within the definition of crime of violence, must be

---

(d) *Unlawful use of handgun or antique firearm in commission of crime; penalties.*—Any person who shall use a handgun or an antique firearm capable of being concealed on the person in the commission of any felony or any crime of violence as defined in § 441 of this article, shall be guilty of a separate misdemeanor....
The State conceded at trial that there was no evidence of the use of a handgun in connection with the burglary of the Haviland home.

accompanied by an intent to commit an offense which itself is punishable by more than one year's imprisonment, we still would hold that the aggravated assault described in § 386 meets that test.  We reach this conclusion because we believe preventing lawful apprehension, as described in § 386, is the equivalent of resisting arrest and/or resisting, hindering or obstructing an officer of the law in the performance of his duties, both of which are offenses recognized at common law and punishable by more than one year in prison. *Busch v. State*, 289 Md. 669, 673, 675, 426 A.2d 954 (1981).  Therefore, the appellant's convictions for assault with intent to prevent lawful apprehension may serve as the predicate crimes to support his convictions for use of a handgun in a crime of violence.

The appellant's final argument related to the aggravated assault convictions is that because the evidence disclosed his firing only two shots, it cannot support convictions of assault with intent to prevent lawful apprehension upon three victims.  This same argument was considered and rejected by this Court in *Jackson v. State, supra,* 63 Md.App. at 157–59, 492 A.2d 346, where the appellant was convicted of two counts of assault with intent to murder despite firing only one shot at two pursuing police officers. *See also Cousins v. State*, 277 Md. 383, 354 A.2d 825, *cert. denied,* 429 U.S. 1027, 97 S.Ct. 652, 50 L.Ed.2d 631 (1976) (where defendant wielded a knife against two store detectives, acquittal on charge of assaulting one detective did not bar subsequent prosecution for assault against the other detective because the two were separate offenses); *Harris v. State*, 42 Md.App. 248, 258, 400 A.2d 6, *rev'd on other grounds sub nom. Countess v. State*, 286 Md. 444, 408 A.2d 1302 (1979) ("assaults against multiple victims arising out of the same criminal incident are separate and distinct crimes").

## FINGERPRINT EVIDENCE

On July 25, 1984, Officer Wayne Hammond of the Latent Print Section of the Montgomery County Police Department

processed the Haviland home which had been burglarized that morning. He dusted the premises and its contents for evidence of fingerprints and was successful in lifting several latent prints from objects within the house. One of these was found on a small cardboard box located in the living room. The box was not seized as evidence nor was it photographed.

The latent print lifted from the cardboard box was compared with fingerprints on record with the Montgomery County Police Department by Charles Felker, a latent print examiner employed by that department. Mr. Felker testified that the latent print found on the cardboard box by Officer Hammond matched a known fingerprint card of the appellant. Officer Ronald S. Bird of the Montgomery County Police Department testified that he had fingerprinted the appellant on November 8, 1977, and prepared the fingerprint card which Mr. Felker compared to the latent print recovered from the cardboard box by Officer Hammond.

■ The appellant challenges certain rulings by the trial judge pertaining to the fingerprint evidence introduced by the State. The first such challenge involves the testimony of Officer Bird, who testified concerning his processing of the appellant's fingerprints following a 1977 arrest of the appellant. Prior to the State's direct examination of Officer Bird, the appellant had objected to the admission into evidence of his fingerprint card, which was dated November 8, 1977 and contained the notations "recidivist" and "burglary." The trial court ruled that the card would not be admitted with that information but that Officer Bird could testify about processing the appellant's prints "as long as he does not bring out anything about any—even a suggestion of any kind of a prior arrest—." During Officer Bird's testimony, certain comments were elicited indicating generally that fingerprint cards were processed in connection with criminal arrests and specifically that Officer Bird had processed the appellant's fingerprints on November 8, 1977. The appellant asserts that those comments constituted evi-

dence of the appellant's prior crimes and that the trial court erred in overruling his objections to such testimony and in failing to provide appropriate curative instructions with respect to the disclosures.

■ It is undeniable that evidence tending to show an accused's prior crimes or bad conduct is generally inadmissible. *Cross v. State*, 282 Md. 468, 473, 386 A.2d 757 (1978). Nevertheless, there are well-established exceptions to the general rule where such evidence is substantially relevant for some other purpose. Specifically, evidence of prior crimes may be admitted if it tends to establish motive, intent, absence of mistake, a common plan or scheme, or the identity of the person charged with the commission of a crime on trial. *Tichnell v. State*, 287 Md. 695, 711–12, 415 A.2d 830 (1980). The State's purpose in presenting Officer Bird's testimony in the case at bar was to establish a foundation for the subsequent testimony of Mr. Felker, who matched the latent fingerprint taken at the scene of the burglary with one of the appellant's known prints. Officer Bird testified that the card which the expert used for comparison did in fact contain the appellant's fingerprints. Officer Bird's testimony thus had direct bearing on identification of the appellant and his nexus with the burglary with which he was charged.

Of course, our inquiry does not end with the observation that evidence of other crimes may be admissible for certain purposes. The admissibility of evidence of other crimes where it serves some purpose within one of the recognized exceptions still depends on a balancing of,

> ... on the one side, the actual need for the other-crimes evidence in the light of the issues and the other evidence available to the prosecution, the convincingness of the evidence that the other crimes were committed and that the accused was the actor, and the strength or weakness of the other-crimes evidence in supporting the issue, and on the other, the degree to which the jury will probably be roused by the evidence to overmastering hostility.

*Jones v. State,* 38 Md.App. 432, 438, 381 A.2d 317 (1978) (quoting C. McCormick, *Evidence* § 190, at 453 (2d ed. 1972)).

We believe that a proper balance was struck by the trial judge here. The State had a legitimate need for testimony linking the appellant to the latent print taken from the crime scene. In order for the appellant to have been prejudiced by Officer Bird's testimony, the jury would have had to infer that the appellant's prior arrest record was evidence of a criminal disposition. We consider it unlikely that the jury drew such an inference based on the statements made by Officer Bird. Officer Bird's testimony did not reveal the appellant's involvement in any particular crime, let alone a crime similar to those for which the appellant was on trial. Moreover, the references to the fingerprint cards were made in vague generalities unlikely to arouse the jury to "overmastering hostility." As we noted in *Simms v. State,* 39 Md.App. 658, 388 A.2d 141 (1978), the law " 'does not demand exclusion of highly probative evidence simply to prevent noisome odors about the defendant from reaching the jury's nostrils.' " *Id.* at 673, 388 A.2d 141 (quoting *United States v. Bradwell,* 388 F.2d 619, 622 (2d Cir.1968)). We find no error in the trial court's rulings relating to the testimony of Officer Bird.

■ The appellant further asserts that the trial court erred in permitting expert testimony that the appellant's known fingerprint matched the latent print recovered from the scene of the burglary. Such testimony should have been excluded, in the appellant's view, because the fingerprint card used as the basis for comparison (the card about which Officer Bird testified) was not admitted into evidence.[6] The appellant contends that the inadmissibility of the fingerprint card deprived him of his right to have the

---

6. The fingerprint card was excluded from evidence following defense counsel's objection to certain prejudicial information appearing on the card.

jury examine and assess the material on which the expert witness based his opinion. We disagree.

The State laid a proper foundation for the expert's comparison through the testimony of Officer Bird. The unavailability of the fingerprint card for the jury's inspection went to the weight of the expert's testimony. We held in *Couser v. State,* 4 Md.App. 543, 547, 243 A.2d 639 (1968), that testimony regarding the lifting of a latent fingerprint from a sign and the comparison of that print to a set of the appellant's known prints was admissible without the physical introduction of the sign and the latent print. We see no distinction here inasmuch as in neither case would the jury be able to make its own fingerprint comparison. *Cf. Jackson v. State,* 13 Md.App. 31, 34, 280 A.2d 914 (1971) (no merit in appellant's claim that photographic identification was inadmissible because the trial judge, sitting as trier of fact, did not have before him for comparison any of the other photographs shown to witness).

■ The appellant next contends that the trial court should have instructed the jury regarding lost evidence. The "lost" evidence at issue was the small cardboard box found at the burglary scene from which the latent fingerprint was lifted. Because the police did not retain custody of the box after the print was lifted,[7] the appellant argues that the jury should have been instructed that the appellant was entitled to a favorable inference regarding the evidence "lost" by the State. We disagree. The following instruction actually given to the jury adequately covered the weight to be accorded the fingerprint evidence introduced at the appellant's trial:

---

**7.** Officer Hammond, who lifted the latent print from the box, explained the failure to take custody of the item from which the print was lifted as in accord with departmental policy. He testified:

Q Officer, is it your practice to seize every item that you obtain a latent print from?

A No sir, with all the burglaries that we have in Montgomery County, it's impossible. We have no place to store all the items.

The identification of the defendant as the perpetrator of the crime must be proved beyond a reasonable doubt. One means of proving this identification is by showing the correspondence between fingerprints found at the scene of the crime and the defendant's fingerprints. You are instructed that the fingerprint evidence found at the scene of the crime must be coupled with evidence of other circumstances tending to reasonably to exclude the hypothesis that the print was impressed at a time other than that of the time of the crime in order to prove the identification of the defendant. If you are not satisfied beyond a reasonable doubt as to the identity of the defendant as the perpetrator of the crime, then you must find the defendant not guilty.

The appellant was not precluded from introducing evidence or arguing that there was some reasonable explanation for the presence of the box with his fingerprint at the crime scene. The trial court's instruction adequately covered the possibility of such alternative explanations. Accordingly, we find no error in the trial judge's refusal to give the additional instruction requested by the appellant.

## JURY COMMUNICATIONS

The appellant contends that he was not informed of certain communications between the court and the jury during the course of jury deliberations, in violation of Maryland Rule 4–326(c) [8] and his right to due process. His argument is grounded on deficiencies in the record of the trial proceedings.

The transcript of the trial contains the following colloquy between court and counsel while the jury was deliberating:

---

**8.** Rule 4–326(c) provides:

(c) *Communications With Jury.*—The court shall notify the defendant and the State's Attorney of the receipt of any communication from the jury pertaining to the action before responding to the communication. All such communications between the court and the jury shall be on the record in open court or shall be in writing and filed in the action.

THE COURT: All right. For the record, I have received a note, "Did the white box belong to Mrs. Haviland (the box from which latent print number 25 was taken)?". I have shown this note to Counsel, and I propose to answer it, "You should use your best recollection of the evidence, not mine. If it is not in evidence, you should not speculate," and sign it.

I understand that the defendant objects to the latter part of that, is that correct?

MR. MASON: As to the second part, we object, Your Honor. We do not object to the first sentence.

THE COURT: Also for the record, I have sent in a cassette of the instructions given prior to argument along with a tape player, and it may or may not be played by the jury. I understand the defendant notes his objection to—

MR. MASON: I thought you sent in a tape of only two instructions.

THE COURT: No, I sent the tape of the entire—

MR. MASON: The entire instructions? Okay. Well, my objection was based upon the fact that it was two instructions.

The record does not contain the jury's note referred to above nor does it contain any note from the trial judge replying thereto. It does, however, include a note from the jury asking the court to define the crimes of assault with intent to murder and assault with intent to avoid lawful apprehension. No response to this note is found in the record nor is the note mentioned in the transcript of the proceedings.[9]

---

9. Judge Miller, the prosecutor, and the appellant's trial counsel, responding to inquiries concerning the two notes posed by the appellant's appellate counsel, stated that they had no specific recollection of the jury notes or the manner in which they were answered.

██ We do not perceive any prejudice to the appellant from these apparent violations of Rule 4–326. Reinstruction of the jury during deliberations is committed to the sound discretion of the trial judge. The trial judge's response to a request for reinstruction will be deemed an abuse only if "ambiguous, misleading or confusing to the jurors." *Oliver v. State,* 53 Md.App. 490, 505, 454 A.2d 856, *cert. denied,* 296 Md. 61 (1983).

As to the first note, there is no suggestion by the appellant that the trial judge replied other than as he proposed to do in his above quoted colloquy with counsel. The only other possibility is that his written response never reached the jury. In either event, the appellant has failed to demonstrate an abuse of discretion necessary for reversal of his convictions.

As to the second note, since the above quoted portion of the transcript reflects that the jury was provided with a recording of the entire instruction given them by the trial judge, they obviously possessed the means to answer the question they had posed in that second communication.

## SENTENCING

██ As a result of the appellant's convictions in this case, the State sought the imposition of a mandatory life sentence upon him pursuant to Md.Code (1957, 1982 Repl. Vol., 1985 Supp.), Art. 27, § 643B.[10] As predicate offenses

---

**10.** Section 643B, insofar as material to the issue here presented, provides:

(a) *"Crime of violence".*—As used in this section, the term "crime of violence" means abduction; arson; burglary; daytime housebreaking under § 30(b) of this article; kidnapping; manslaughter, except involuntary manslaughter; mayhem and maiming under §§ 384, 385, and 386 of this article; murder; rape; robbery; robbery with a deadly weapon; sexual offense in the first degree; sexual offense in the second degree; use of a handgun in the commission of a felony or other crime of violence; an attempt to commit any of the aforesaid offenses; assault with intent to murder; and assault with intent to rape.

for the invocation of this enhanced punishment, the prosecutor relied on the following convictions and sentences:

1. On August 15, 1974, the appellant pleaded guilty in the Circuit Court for Montgomery County to daytime housebreaking in violation of Article 27, § 30(b), and on November 13, 1974, he was sentenced to 18 months imprisonment under the jurisdiction of the Montgomery County Department of Corrections. He served that sentence.

2. On May 1, 1978, the appellant pleaded guilty in the Circuit Court for Montgomery County to a daytime housebreaking under Article 27, § 30(b). He was sentenced on June 12, 1978 to the Maryland Department of Correction for eight years, three years of which were suspended. While serving this sentence the appellant escaped from the Maryland House of Correction at Jessup, Maryland. A fugitive warrant issued for him was executed when he was apprehended for a statutory burglary in Roanoke, Virginia on August 1, 1979. He was returned to the Maryland House of Correction, by the Virginia authorities, on July 24, 1980, and served the balance of his sentence. The appellant was released on March 12, 1983.

3. On April 31, 1980, the appellant was sentenced to two years imprisonment by the Circuit Court of the City of Roanoke, Virginia for a statutory burglary under Va.Code (1950, 1982 Repl.Vol.) § 18.2–91. That sentence began to run on August 1, 1979, the date of his arrest for that offense. On July 24, 1980, he was

---

The term "correctional institution" includes Patuxent Institution and a local or regional jail or detention center.

(b) *Mandatory life sentence.*—Any person who has served three separate terms of confinement in a correctional institution as a result of three separate convictions of any crime of violence shall be sentenced, on being convicted a fourth time of a crime of violence, to life imprisonment without the possibility of parole. Regardless of any other law to the contrary, the provisions of this section are mandatory.

paroled by the Virginia authorities and was returned
to Maryland.

The sentencing judge declined to impose the mandatory
life sentence, ruling that the Virginia conviction was not for
a crime of violence as defined in § 643B(a). Specifically,
the court found that a daytime housebreaking from a for-
eign jurisdiction could never be used for purposes of en-
hanced punishment under § 643B because the definition of
"crime of violence" in subsection (a) specifies "daytime
housebreaking *under § 30(b) of this article*" (emphasis
added). We disagree with that interpretation of § 643B(a).

Chapter 479 of the Laws of 1982 added the crimes of
"burglary" and "daytime housebreaking under § 30(b) of
this article" to those crimes of violence qualifying for
enhanced punishment under § 643B. This very amendment
was before the Court of Appeals for construction in *Haw-
kins v. State*, 302 Md. 143, 486 A.2d 179 (1985). The issue
there was whether a conviction for daytime housebreaking
committed prior to the effective date of the amendment
could be utilized as a predicate offense for mandatory
sentencing under § 643B. The Court of Appeals held that
the Legislature intended that such use be made. The Court
reasoned:

[B]oth the Supreme Court and this Court have recog-
nized that enhanced punishment statutes like § 643B may
constitutionally include predicate offenses within their
ambit without regard to when such offenses were com-
mitted—a fact which the legislative body is presumed to
know when it enacts such legislation. *See Demory
Brothers v. Bd. of Pub. Works*, 273 Md. 320, 326–27, 329
A.2d 674 (1974); *Macke Co. v. St. Dep't of Assess. & T.*,
264 Md. 121, 132, 285 A.2d 593 (1972). Section 643B does
not explicitly or impliedly limit daytime housebreaking as
a crime of violence to only such of those offenses as are
committed on or after July 1, 1982, the effective date of
the amendment to the statute. We think it plain that the
legislature intended that daytime housebreaking be taken
into account as a qualifying crime of violence for en-

hanced punishment purposes irrespective of when the offense was committed or the conviction obtained.

302 Md. at 148–49, 486 A.2d 179.

Similarly, in *Blandon v. State,* 304 Md. 316, 498 A.2d 1195 (1985), the Court relied on the judicial interpretation of Article 27, § 643B since the original enactment of the provision in 1975 in determining the legislative intent to include second degree rape as a crime of violence within the term "rape" employed in § 643B. The Court explained:

> The alleged ambiguity arises because the legislature was degree specific as to which sexual offenses constitute "crimes of violence" but did not specify or distinguish among degrees of rape in the same context. Appellant maintains that this doubt should be resolved by our finding that the term "rape" as used in § 643B(a) encompasses only first degree rape. We disagree.
>
> As we have stated time and again, in cases of ambiguity or doubt, a statute must be construed to effectuate the real and actual intention of the legislature. *See State v. Intercontinental, Ltd.,* 302 Md. 132, 137, 486 A.2d 174 (1985). Moreover, rules of statutory construction require us to avoid construing a statute in a way which would lead to absurd results. *Holy Cross Hosp. v. Maryland Empl. Sec.,* 288 Md. 685, 698–99, 421 A.2d 944 (1980); *Coerper v. Comptroller,* 265 Md. 3, 6, 288 A.2d 187 (1972). In other words, we should reject a proposed statutory interpretation if its consequences are inconsistent with common sense. *State v. Intercontinental, Ltd., supra,* 302 Md. at 137, 486 A.2d 174; *Bailey v. Woel,* 302 Md. 38, 43, 485 A.2d 265 (1984).

· · · · ·

> As the State correctly points out, an adoption of appellant's position would result in enhanced punishment being meted out to the defendant who by force or threat of force, against the will and without the consent of the victim engaged in a "sexual act" but not to the defendant who culminates the same conduct with an act of vaginal

intercourse. We can not presume the legislature intended such disparate results.

Nor can we reconcile such illogical results with what we have determined to be the legislative intent behind § 643B. In *Hawkins v. State* this Court stated, "The purpose of [§ 643B] ... is to protect the public from assaults upon people and injury to property and to deter repeat offenders from perpetrating other criminal acts of violence...." 302 Md. 143, 148, 486 A.2d 179 (1985).

.     .     .     .     .

If a statute is part of a general statutory scheme or system, the various sections must be read together to ascertain the true intention of the legislature. *Mazor v. State, Dep't of Correction,* 279 Md. 355, 361, 369 A.2d 82 (1977).

304 Md. at 319, 321–22, 498 A.2d 1195.

Thus, in determining the Legislature's intent in enacting Chapter 479 of the Laws of 1982, we must view the addition of "daytime housebreaking under § 30(b) of this article" in light of the judicial construction of the legislative design for violent criminal recidivists which was known to the legislators in 1982. The appellate courts of this State have consistently held that convictions for crimes of violence obtained in other jurisdictions may be considered in applying the enhanced punishment provisions of § 643B.

In evaluating whether foreign convictions are "crimes of violence" as required by the statute, a two step process has evolved. First, we determine whether the Maryland counterpart to the foreign crime is one of those classified in the statute as a "crime of violence." *See DiBartolomeo v. State,* 61 Md.App. 302, 312–13 [486 A.2d 256] (1985); *Mitchell v. State,* 56 Md.App. 162, 183–84 [467 A.2d 522] (1983). Once it is determined that the counterpart Maryland offense is among those set out in the statute, we then look to the law of the foreign jurisdiction for its definition of that crime. If the elements of the crime as established by the foreign jurisdiction are suffi-

ciently limited to those elements by which the crime is established in this State, it qualifies as a violent crime under our statute. *Temoney v. State,* 290 Md. 251, 262–64 [429 A.2d 1018] (1981); *DiBartolomeo,* 61 Md. App. at 312–13 [486 A.2d 256]. If the crime meets both classification and definition requirements, it may be used for the purposes of applying the enhanced punishment statute.

*Watson v. State,* 68 Md.App. 168, 173–74, 510 A.2d 1094 (1986).

It seems incongruous to us that the Legislature intended that convictions of other crimes of violence from foreign jurisdictions be considered in applying the enhanced punishment provisions of § 643B while daytime housebreaking convictions from other jurisdictions could not. Therefore, we interpret the language "under § 30(b) of this article" appended to the crime of daytime housebreaking in § 643B(a) as simply a legislative directive that the elements of the crime of daytime housebreaking as defined in § 30(b) must be established before a foreign conviction of daytime housebreaking can be utilized as a predicate for mandatory sentencing. Although it appears from the record of the sentencing hearing that the trial judge believed the appellant's Virginia conviction satisfied the elements of daytime housebreaking under § 30(b), we vacate the sentences imposed and we will remand the case in order that he may reconsider sentencing in light of our interpretation of § 643B(a).

■ Finally, we reject the cross-appellee's arguments that the State failed to produce sufficient evidence of his three prior convictions of crimes of violence and incarceration as a result of each conviction. More particularly, we find no merit in his assertions that there was no evidence that the building broken into in Roanoke, Virginia on July 27, 1979, was a dwelling house. The State, in order to avoid the problem encountered by the prosecutors in *Temoney v. State, supra,* and *Butler v. State,* 46 Md.App. 317, 416 A.2d

773, *cert. granted,* 288 Md. 732, *dismissed upon the State's motion* (1980), called as a witness at the sentencing hearing the detective who investigated the break-in of which the cross-appellee was convicted. He testified that the building which was entered illegally by the cross-appellee *was the home of the Chief of Police of the City of Roanoke!*

■ The cross-appellee fares no better on his contention that the State failed to prove that he served a period of incarceration on his 1974 conviction of daytime housebreaking. A presentence investigation report was prepared at the request of the court in the case *sub judice* by the Division of Parole and Probation in accordance with Md. Code (1957, 1982 Repl.Vol., 1985 Supp.), Article 41, § 124. The report was delivered to the cross-appellee's trial counsel prior to the hearing as required by Rule 4–341. That report, which is part of the record, discloses the 1974 conviction and the service of the sentence thereon at the Montgomery County Detention Center. The presentence investigator indicates that the source of that information was the records of the Montgomery County Police Department. The record further reflects that at the sentencing hearing the court was advised by the cross-appellee's attorney of his review of the presentence report with his client on the day prior to sentencing. Thereafter, that attorney pointed out a number of alleged errors in the report. None of these allegations shed any doubt upon the accuracy of the recitation in the report of the cross-appellee's service of the sentence imposed upon him for his 1974 conviction of daytime housebreaking. Under these circumstances, which are tantamount to a judicial admission, we hold that there was competent evidence before the sentencing judge of incarceration as a result of the 1974 conviction to permit its use as a predicate offense for mandatory sentencing under Article 27, § 643B(b). *Butler v. State, supra,* 46 Md.App. at 323, 416 A.2d 773; *cf. Irby v. State,* 66 Md.App. 580, 584, 505 A.2d 552 (1986), and *Teeter v. State,* 65 Md.App. 105, 113–14, 499 A.2d 503 (1985).

JUDGMENTS AS TO THE CONVICTIONS UNDER COUNTS 3, 6 AND 9 OF INDICTMENT NO. 35100 REVERSED. JUDGMENTS AS TO THE CONVICTIONS UNDER ALL OTHER COUNTS AFFIRMED. SENTENCES VACATED AND CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR RESENTENCING IN ACCORDANCE WITH THIS OPINION.

COSTS TO BE SHARED EQUALLY BY THE APPELLANT AND MONTGOMERY COUNTY.

ROBERT M. BELL, Judge, dissenting.

I respectfully dissent from the majority's discussion under the heading "The Aggravated Assaults" and its conclusion that under the facts of this case, appellant could properly be convicted of the crime of assault.

As a threshold matter, the entire discussion is nothing more than dicta. More to the point, it is totally unnecessary. Appellant complains about his convictions of assault with intent to murder and assault with intent to prevent lawful apprehension. As to the latter, the majority quite properly points out that appellant failed to preserve that issue for appellate review: he both failed to raise the question at trial and conceded the sufficiency of the evidence to convict. No discussion of the underlying assault charge is necessary, therefore, in connection with that issue. That being so, there is also no necessity to discuss the underlying assault charge with regard to the assault with intent to murder charge. This is true because, as the majority so aptly points out, under no circumstances could the conduct proven have been sufficient to constitute the crime of assault with intent to murder. Therefore, we need only have assumed for the sake of argument, but not decided, that the conduct proven would constitute assault. In so proceeding, we would properly have allowed the issue whether an assault was committed under these circumstances to be resolved on another day and on a set of facts requiring that we do so.

Since however, the majority has discussed the sufficiency of the evidence to prove assault, I will address that issue as well. Contrary to the conclusion reached by the majority, I am not convinced that there was sufficient proof that appellant committed the crimes of assault. The evidence relied upon, and found sufficient by the majority, are two gunshots fired in a wooded area. These shots were fired, as the evidence makes clear, in the following context. The officers were chasing appellant on foot when appellant ran into the wooded area. The officers released the K–9 dog, which was accompanying them, to pursue and catch appellant. After the dog entered the wooded area and just as the officers reached the edge, but prior to their entering it, they heard a gunshot and saw a muzzle flash. They heard a second gunshot seconds later, at which time they ordered the dog to retreat. Neither officer saw, or knew, at that time, who fired the shots; at whom, if anyone, they were directed; or even in which direction they were fired.

I submit that this evidence is insufficient to prove an assault on the officers. To be sure, there was evidence of two gunshots, but that evidence, without more, does not rise to the level of that "reasonably tending to create the apprehension in [the officers] that [appellant was] about to apply force" to them, a necessary element of the crime which must be proven by the State. *See Dixon v. State,* 302 Md. 447, 464, 488 A.2d 962 (1985) (Eldridge J., dissenting).

The majority relies upon *Dixon v. State* and the definition of assault set out therein,[1] as support for their conclusion that the officers were assaulted. They conclude:

---

1. "[A]ny attempt to apply the least force to the person of another constitutes an assault. The attempt is made whenever there is any action or conduct reasonably tending to create the apprehension in another that the person engaged therein is about to apply such force to him. It is sufficient that there is an apparent intention to inflict a battery and an apparent ability to carry out such intention." 302 Md. at 458–59, 488 A.2d 962.

The evidence before us in the present case indicates that the three police officers who pursued the appellant were placed in fear of bodily harm when the appellant fired two shots. It seems entirely reasonable that the firing of those shots from a dark wooded area, at close enough range that the officers could see a muzzle flash, would cause the officers to believe that their safety was being threatened by the appellant. It matters not what the appellant's specific intention was in firing the gun since assault is a general intent crime. We hold that the appellant's conduct under these circumstances placed the officers in reasonable apprehension of immediate bodily harm and rendered him guilty of assaulting them.

At 45.

In the majority's view, therefore, it is enough to constitute the crime of assault if shots are fired in close enough proximity to a person to enable that person to see a muzzle flash. This, they say, causes that person to be in reasonable apprehension of immediate bodily harm. It makes no difference to the majority that there is absolutely no proof of an apparent intention to inflict a battery upon that person, so long as the apparent ability to do so is present.

I think the majority paints with too broad a stroke. The definition of assault adopted in *Dixon* contemplates the proof of both an apparent intent to commit a battery *and* the apparent ability to carry out the intention, which together, enable the trier of fact to determine if the person allegedly threatened was in "reasonable apprehension of immediate bodily harm." Under the majority's analysis, which requires only proof of the apparent ability to inflict harm, any person in the area, not only the officers who were chasing appellant, would be an assault victim. Such a result is untenable. It should be recalled that after appellant entered the wooded area, the officers released the K–9 dog to apprehend him. It was after the dog pursued appellant into the woods that the shots were heard. It is therefore all too obvious at whom the shots were directed; *they were directed at the dog, not at the police officers.*

Under these circumstances, I submit that more is required to permit the inference that appellant had the apparent intention to inflict a battery upon the officers. I further submit, and for the same reason, that not only must the apparent ability to inflict harm be proven, but that the apparent intention to do so, must be proven as well. Not only was this not done in this case, but the majority does not even require it.

The facts in this case are less favorable to the State than were the facts in *Dixon*. In *Dixon*, it was at least possible to conclude from the circumstances that Dixon had the apparent intention to inflict a battery upon the victim if she did not comply with his demand for money: he was face to face with her; he spoke directly to her; and it was to her that the cold, hard stare was directed. Here, there was no evidence of any action taken by appellant prior to entering the wooded area, from which it could be inferred that he intended to inflict a battery on the officers or had the ability to do so. Once in the wooded area, pursued by the dog, all one can determine is that shots were fired. It is pure speculation and an unwarranted extension of the definition of assault set out in *Dixon* to conclude that this is sufficient to form the predicate for an assault conviction. Accordingly, I dissent.